PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS,
et al., Plaintiffs,

v.

U.S. BUREAU OF RECLAMATION,
Defendant,

and

Klamath Water Users Assoc.,
Intervenor.

No. C 00–01955 SBA.

United States District Court,
N.D. California.

April 3, 2001.

Patti A. Goldman, Todd D. True, Kristen Boyles, Jan E. Hasselman, Earthjustice Legal Defense Fund, Seattle, WA, Michael R. Sherwood, Earthjustice Legal Defense Fund, San Francisco, CA, for plaintiffs.

Lyn Jacobs, U.S. Department of Justice, Wildlife and Marine Resources Section, Washington, DC, Stephen M. MacFarlane, U.S. Department of Justice, Environmental & Natural Resources Division, John A. Mendez, Paul S. Simmons, Somach, Simmons & Dunn, Sacramento, CA, for defendants.

Lea Ann Easton, Oregon Legal Services, Portland, OR, amicus curiae.

## ORDER

ARMSTRONG, District Judge.

This matter comes before the Court on the following motions: (1) plaintiffs' motion for summary judgment [Docket No. 65–1]; (2) defendants' cross-motion for summary judgment [Docket No. 88–1]; (3) the Intervenor's motion for summary judgment [Docket No. 80–1]; (4) Intervenor's request for judicial notice [Docket No. 105–1]; and (5) intervenor's evidentiary objections and request to strike declarations of Tim McKay, Felice Pace and Glen Spain, and exhibits A and C to the second declaration of Jan E. Hasselman [Docket No. 103–1].

Having read and considered all the papers filed in connection with these motions, having considered the arguments advanced by the parties and being fully informed, the Court hereby (1) GRANTS plaintiffs' motion for summary judgment [Docket No. 65–1]; (2) GRANTS in part and DENIES in part defendants' cross-motion for summary judgment [Docket No. 88–1]; (3) GRANTS in part and DENIES in part

Intervenor's motion for summary judgment [Docket No. 80–1]; (4) DENIES Intervenor's Request for Judicial Notice [Docket No. 105–1]; and (5) DENIES Intervenor's Request to Strike Declarations and Exhibits [Docket No. 103–1].

## I. BACKGROUND

### A. Factual History

#### 1. Klamath Project

This is a water rights case involving The Klamath Project. "The Klamath Project, located within the Upper Klamath and Lost River Basins in Oregon and California, was authorized by Congress in 1905 pursuant to the Reclamation Act of 1902 (32 Stat. 388). In 1905, in accordance with state water law and the Reclamation Act, the United States appropriated all available water rights in the Klamath River and Lost River and their tributaries in Oregon and began constructing a series of water diversion projects." *Klamath Water Users Assoc. v. Patterson*, 15 F.Supp.2d 990, 991–92 (D.Or.1998), *aff'd*, 204 F.3d 1206 (9th Cir.), *cert. denied*, —— U.S. ——, 121 S.Ct. 44, 148 L.Ed.2d 14 (2000); Administrative Record (also referred to herein as "AR") 1:13:30.[1]

Water for the Klamath Project is stored primarily in Upper Klamath Lake on the Klamath River. (AR 1:13:23; Wirkus Dec. ¶ 3) Upper Klamath Lake is located wholly in Oregon. (AR 1:1:1–2) It is a naturally occurring lake born out of a natural rock formation. (Wirkus Dec. ¶ 3) In 1917, Link River Dam was constructed near the mouth of Upper Klamath Lake to allow the lake to be drawn below its natural level, as well as to increase storage in the lake to supply water for irrigation and other purposes. (*Id.*)

The Link River Dam regulates flows in the lower Klamath River. (AR 1:13:32, 43) It is owned by the federal defendant, the U.S. Bureau of Reclamation, but operated and maintained pursuant to contract by a power company named PacifiCorp. (AR 1:13, 32, 43: Wirkus Dec. ¶ 4) PacifiCorp also owns and operates the canals that carry the water from Upper Klamath Lake to the Link River, and it operates several hydroelectric and/or re-regulating dams on the Klamath River pursuant to a license issued by the Federal Energy Regulatory Commission ("FERC") (previously the Federal Power Commission). (AR 1:13:43; Wirkus Dec. ¶ 4) The furthest downstream of these dams is the Iron Gate Dam in California, which PacifiCorp also owns. (AR 1:10:125–127; Wirkus Dec. ¶ 4)

The Klamath Project serves and affects a number of interests. Two fish which are listed as "endangered" under the Endangered Species Act (also referred to herein as "ESA"), 16 U.S.C. § 1531, *et seq.*, 53 Fed.Reg. 27130 (July 18, 1988), the shortnose sucker and the Lost River sucker, live in Upper Klamath Lake and nearby Project waters and nowhere else. Upper Klamath and Clear Lake National Wildlife Refuges also benefit from lake elevations. The Klamath Project supplies irrigation water to agricultural lands. It also supplies water to Tule Lake and Lower Klamath National Wildlife Refuges for permanent and seasonal marshlands and irrigated crop lands. Below Iron Gate Dam, the Lower Klamath River is used by various species of fish, including the Southern Oregon/Northern California Coast ("SO/NCCC") Evolutionary Significant Unit ("ESU") of coho salmon, which was listed as "threatened" under the ESA in 1997, see, 62 Fed.Reg. 24, 588 (May 6,

---

1. Citations to the Administrative Record lodged with the Court refer to the volume, tab, and Bates-stamped page number.

1997). After the water leaves the Klamath Project area, it remains important to the Klamath River habitat in both Oregon and California. (AR 1:13:23–25, 1:15:282–283; Wirkus Dec. ¶ 5)

The Secretary of the Interior, through the Bureau of Reclamation, must manage and operate the Klamath Project pursuant to various legal responsibilities. Pursuant to the Reclamation Act of 1902, 32 Stat. 390, 43 U.S.C. § § 371, *et seq.*, as amended and supplemented, for example, the Bureau of Reclamation has entered into contracts with various water districts and individual water users to supply water, subject to availability, for irrigation purposes. (AR 3:33:336–338, 342) Two national wildlife refuges, the Lower Klamath and Tule Lake National Wildlife Refuges, also are dependent on the operations of Klamath Project and have federal reserved water rights to the amount of water, unreserved at the time of creation of the refuges, necessary to fulfill the primary purpose of the refuges.[2] (AR 3:33:338–339) "In addition, the Secretary of the Interior has recognized that a number of Oregon tribes, including the Klamath, Yurok and Hoopa valley tribes (the "Tribes"), hold fishing and water treaty rights in the [Klamath] basin." *Klamath Water Users Protective Assoc. v. Patterson,* 204 F.3d 1206, 1209 (9th Cir.1999), *cert. denied,* —— U.S. ——, 121 S.Ct. 44, 148 L.Ed.2d 14 (2000). (AR 3:33:339–342)[3] The Bureau of Reclamation has an obligation to protect Tribal trust resources, including the Klamath River coho salmon. (AR 9:293:4781–4782) It also has

an obligation under the ESA not to engage in any action that is likely to jeopardize the continued existence of an endangered or threatened species or result in the destruction or adverse modification of the critical habitat of such a species. (AR 3:33:9) *See,* 16 U.S.C. § 1536(a)(1).

The Bureau of Reclamation must manage water resources carefully in order to meet its competing purposes and obligations. This need to strike a proper balance is particularly challenging because the Upper Klamath Lake is relatively shallow and, therefore, the Klamath Project's storage capacity is limited. Water levels in the Lake vary from year to year, depending to a significant extent upon the previous winter's snowfall and temperature, and on precipitation conditions during the spring and summer. (Wirkus Dec. ¶ 6)

In order to prepare Project operation plans, the Bureau of Reclamation relies on the Natural Resources Conservation Service ("NRCS") Streamflow Forecast for key areas in the Upper Klamath Basin. The NRCS forecast period runs from April 1 to the end of the current water year, September 30. NRCS issues its forecasts on a monthly basis, between January and June. The reliability of these forecasts increase with each month, as the forecast period becomes shorter. (Wirkus Dec. ¶ 22; AR 7153:3983) Weather changes during the year, however, (for example, due to unusually hot and dry conditions, or unusually rainy conditions) may significantly affect Upper Klamath Lake inflows as well. (AR 8:227:4384; AR 7:183:4180)

---

**2.** The refuges also receive significant quantities of return flows and other project waters which although initially used for irrigation purposes, are beneficially reused for refuge purposes. (AR 3:33:338–339)

**3.** *See, U.S. v. Adair,* 723 F.2d 1394, 1408–11, 1414–15 (9th Cir.1983) (holding that the Kla-

math Basin Tribes hold implied water rights to support hunting and fishing rights guaranteed by treaties between Tribes in Oregon and California and United States, and that these water rights "carry a priority date of time immemorial").

Pending completion of a long-term plan, in 1995, the Bureau of Reclamation began developing annual plans for operation of the Klamath Project. The purpose of these plans was to provide information concerning the criteria to be used in operating the Project during the year and to assist water users and resource managers in planning for the water year. (Wirkus Dec. ¶ 11; AR 2:30:1167; AR 3:41:1463; AR 4:52:1637; AR 4:56:1843; AR 4:61:2184) On April 26, 2000, the Bureau of Reclamation issued its operations plan for 2000. See, 9:292:4776. Since 1996, the Bureau of Reclamations also has been working to develop a multi-year operations plan. (AR 4:63:2350) To date, however, no such long-term plan has been completed.

## 2. The Southern Oregon/Northern California Coastal Coho Salmon

Plaintiffs' claims in this suit revolve around the needs of the SO/NCC coho salmon. As noted above, the National Marine Fisheries Service ("NMFS") has listed this species as "threatened" under the ESA. See, 62 Fed.Reg. 24, 588 (May 6, 1997). The Klamath River downstream of Iron Gate Dam has been designated as a "critical habitat" for the SO/NCC salmon. (AR 4:63:2382) See, 64 Fed.Reg. 24,049, 24,062 (May 5, 1999). The level of the instream flow in this region forms an important part of the species' habitat needs. See, AR 5:64:2380–2381; AR 9:273:4655–58. A decreased flow reduces the streamside edge habitat (which preferably should be inundated with multi-stream vegetation to avoid predation by birds and other fish and to provide relief from the velocity of free flowing water), which in turn allegedly results in increased mortality among the young of the species. (Pierce Dec. ¶ ¶ 30–34)

Since 1962, instream flows in this region have been substantially determined by the minimum flow regime specified at Iron Gate Dam under PacifiCorp's license from the Federal Energy Regulatory Commission ("FERC"). Although PacifiCorp is obligated to meet FERC minimum flows, they have operated the facility according to the Bureau of Reclamation Annual Operating Plans since 1996. (AR 5:64:2380)

### 3. Dr. Hardy's Phase I Report

In 1998, the Department of the Interior commissioned Dr. Thomas Hardy of Utah State University to provide a comprehensive review of the historical and existing status of the anadromous fish, including the coho salmon, within the lower Klamath River (i.e., below Iron Gate Dam). (AR 5:64:2377; Hardy Dec. ¶ 4) Dr. Hardy was asked to make recommendations in two steps. The first step ("Phase I") was intended to supply initial recommendations for use in developing annual operations plans, while the second step of the study ("Phase II") was underway. (Jacobs Dec. ¶ 2, Ex. 3, p. 2)

Dr. Hardy released his final Phase I report on August 5, 1999. He relied in preparing it upon the collaborative efforts of a technical review team composed of representatives from the U.S. Fish and Wildlife Service, Bureau of Reclamation, Bureau of Indian Affairs, U.S. Geological Survey, the NMFS, the Yurok, Hoopa and Karuk Tribes, and California's Department of Fish and Game. (AR 5:64:2377; Hardy Dec. ¶ 4) Because necessary site-specific information for the Klamath River was not available at the time, Dr. Hardy conducted an extensive literature review of the historical and current status, as well as life history traits, of the Klamath River fishery.

Based upon this review, the Phase I report recommended the following "interim minimum monthly flow" levels for the main stem Klamath River below Iron Gate Dam, which Dr. Hardy characterized as a

"starting point" for restoration and maintenance of the aquatic resources within the Klamath River: *January, 2000:* 2421 cubic feet per second ("cfs"); *February, 2000:* 3008 cfs; *March, 2000:* 3073 cfs; *April, 2000:* 3307 cfs; *May, 2000:* 3056 cfs; *June, 2000:* 2249 cfs; *July, 2000:* 1714 cfs; *August, 2000:* 1346 cfs; and *September, 2000:* 1395 cfs. (AR 5:64:2377, 2380, 2429 (Table 17); Hardy Dec. ¶¶ 4–7) In characterizing this recommendation as a "starting point", Dr. Hardy recognized that efforts were continuing to complete more detailed site-specific studies within the basin and to apply additional assessment techniques which might provide a more refined flow recommendation for the restoration and maintenance of the Klamath River fishery. (AR 5:64:2377, 2380; Hardy Dec. ¶ 7)

#### 4. *The Klamath Project 1999 Operations Plan*

Federal statute and regulations require that the Bureau of Reclamations prepare a biological assessment if it learns from the Secretary of the Interior that a threatened or endangered species may be present in the area where it proposes to take action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.14(a), 402.01(b). The purpose of the biological assessment is to determine whether the species "is likely to be affected" by the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. With respect to the SO/NCC coho salmon, the Secretary has delegated her authority to the NMFS. 50 C.F.R. § 402.01(b). If the Bureau determines that a protected species may be affected by its proposed action, it must send the NMFS a written request for formal consultation, and the NMFS must prepare a biological opinion stating whether, in its opinion, the proposed action is likely to jeopardize the protected species. 16 U.S.C. § 1536(a)(2) & (b); 50 C.F.R. §§ 402.14(a), (c), (h)(3). *See,* additional discussion concerning this regulatory framework, *infra* at Section II, A, 2, b.

The Bureau of Reclamations requested formal consultation with the NMFS concerning its Klamath Project 1999 Operations Plan.[4] (AR 7:156:4040) As a result of this consultation, on July 12, 1999, NMFS issued a biological opinion. The biological opinion concluded that the 1999 Annual Operations Plan *would* adversely affect coho salmon populations in the Klamath River, but that it was not likely to *jeopardize* the continued existence of this species or its critical habitat. (AR 4:63:2347) The NMFS concluded, however, that more information was necessary in order to fully understand the relationship between Iron Gate Dam releases and available coho salmon habitat and water quality in the Klamath River, particularly during the summer months, and it noted that the Bureau had committed to obtain additional information and analyses to assist in developing future operations plans. The NMFS' biological opinion deemed the completion of a long-term plan to guide project operations to be "very important". (*Id.*)

The Bureau's 1999 Operations Plan covered the period from April 1999 to March 2000, and the NMFS' biological opinion, therefore, covered the anticipated effects of this plan during this period only. (AR 4:63:2345, 2363; AR 7:156:4040) The NMFS expressly noted that, while it concluded the 1999 Operations Plan was not likely to "appreciably diminish the value of [the coho salmon's] designated critical habitat for both the survival and recovery of the species", the same could not be said of

---

4. *See,* AR 7:156:4040 (confirming that the Bureau also requested formal consultation concerning its 1998 Operations Plan).

operations after March, 2000, and it emphasized the importance of the Bureau of Reclamation's "timely development and implementation of a multi-year operations plan that consider[ed] various water types (e.g., wet, dry) and maintenance of adequate aquatic habitat through multi-year time scales." (AR 4:63:2363)

### 5. The Klamath Project 2000 Operations Plan

The Bureau of Reclamation had hoped to have the benefit of Dr. Hardy's Phase II report in preparing its operations plan for the Klamath Project's 2000 water year. The Phase II report was expected to quantify, for the first time, flow and habitat relationships, and the appropriate river flow needed to maintain and protect the ecological function of the Klamath River below Iron Gate Dam. (Dugan Dec. ¶ 5; Hardy Dec. ¶ ¶ 4–7; AR 7:133:3779) Completion of the report was delayed, however, and, consequently, the Bureau was compelled to prepare its annual plan without this report. (AR 7:133:3779)

### a. The YOY Concept & Proposal

In early-March, 2000, the Bureau received indications that the 2000 water year would be dryer than 1999 and, thus, that water availability would be less and irrigation demand would be higher than 1999. (Pierce Dec. ¶ 16; AR 9:293:4781) In lieu of the minimum flows recommended in the Phase I report, the Bureau subsequently outlined a draft instream flow proposal based upon the "young of the year" ("YOY") concept. (AR 7:133:3778–3781) The YOY proposal included the following flow recommendations: *April 1–May 15, 2000:* 2500 cfs; *May 16–30, 2000:* 1800 cfs; *June 1–15, 2000:* 1300 cfs; *June 16–August, 2000:* 1000 cfs; *September, 2000–February, 2001:* 1300 cfs; and *March, 2001:* 2500 cfs. (AR 7:133:3773–3782) These flow recommendations were markedly lower than those proposed in the

Phase I report. (Hasselman Dec. Ex. 7, p. 5)

The Bureau presented the YOY concept, and the related flow proposals, at a series of technical review team meetings held during mid-March, 2000. The purpose of these presentations allegedly was to gather additional information regarding the interplay between water temperatures and habitat conditions, and the ramifications of this interplay for fish survival. The Bureau allegedly hoped to generate discussions concerning the underlying assumptions and limits of the analysis in the Phase I report concerning water quality. (Dugan Dec. ¶¶ 24–25) In the Phase I report, for example, Dr. Hardy acknowledged that the hydrological-based analyses contained therein implicitly assumed other factors such as water temperature were not limiting, an assumption that he specifically noted was "not true for the main stem of the Klamath River below Iron Gate Dam where deleterious water temperatures and low dissolved oxygen [had] been associated with fish kills during the late summer low flow period". (AR 5:64:2423) The Bureau of Reclamation allegedly sought to explore, therefore, whether higher flows actually could increase the survival rate of young salmonids during the summer when water quality was limiting. (Dugan Dec. ¶¶ 25–26)

The YOY concept, and the related flow proposals, were met with concern and criticism by the members of the technical review team. (Pierce Dec. ¶ 17) In a letter following these meetings, the Yurok Tribe, for one, argued that Dr. Hardy's Phase I report was the best available science, that it had been based upon extensive input from all technical team members, including Bureau of Reclamation staff, and was created specifically to address the situation then confronting the Bureau, namely, the need to present instream flow recommen-

dations without completed site-specific studies. The Yurok Tribe argued that the Bureau should implement the minimum flow recommendations contained in the Phase I report, and not those based on the YOY concept presented at the recent technical review team meetings. (Pierce Dec. Ex. D)

California's Department of Fish and Game concurred in this recommendation, noting that "a major goal" of the Phase I report had been "to eliminate uncertainty regarding aquatic resource flow needs and, thus, avoid last minute negotiations each year over water allocation decisions". (Hasselman Dec. Ex. 7, p. 3) Like the Yurok Tribe, the Department of Fish and Game deemed the flow recommendations contained in the Phase I report to be "the best presently available science for determining the flow needs of Klamath River anadromous salmonids including coho salmon", and it urged the Bureau of Reclamation to adopt them. (*Id.*) The Department argued that the YOY coho concept, in contrast, would "not provide sufficient flows to adequately sustain and protect juvenile coho and other anadromous fish species in the Klamath River." (*Id.*, p. 6)

### b. *The April 4, 2000 Proposal*

Following this negative response to the YOY concept, and the related flow proposals, on April 4, 2000, the Bureau of Reclamation released a "Klamath Project: Draft 2000 Annual Operations Plan, Decision Memorandum". This memorandum proposed the following new set of instream flow recommendations for the Klamath River: *April 1–15, 2000:* 1550 cfs; *April 16–30, 2000:* 1400 cfs; *May 1–15, 2000:* 1200 cfs; *May 16–September 30, 2000:* 1000 cfs; *October 1, 2000–March 31, 2001:* 1300 cfs. (AF 7:167:4087–4091) These flow recommendations met only 41.5 percent of the Phase I report recommendations and 61.6 percent of the YOY coho concept pro-

posed flows. The flows proposed for the month of September, 2000 also were significantly below the FERC minimum of 1300 cfs. The April 4, 2000 proposal for flow levels would have resulted in almost no reduction in water deliveries to agriculture (0 to 3 percent), however, compared with the 16 to 28 percent reduction for agricultural deliveries inherent in the earlier YOY concept flow proposal. (Hasselman Dec. Ex. 8, pages 1–3)

Members of the technical review team were provided no more than a day to ·respond to the April 4, 2000 set of flow recommendations. Nevertheless, they managed to assemble and submit written responses. In these responses, the team members objected strenuously to the proposed flow levels, arguing that (if implemented) they would have a significant negative impact on anadromous fish species. They again urged the Bureau to apply the recommended flows presented in the Phase I report because it contained "the best available science". (Pierce Dec. ¶¶ 18–19, Ex. E; AR 7:165:4080–4081; Hasselman Dec. Ex. 8; AR 8:200:4257–4260; AR 7:170:4110–4115)

### c. *The April 12, 2000 Proposal*

That same week, the Bureau of Reclamation turned to Dr. Hardy for assistance, asking that he reassess recommended flows below Iron Gate Dam for the period from April to September, 2000 using site specific data and analyses available as a result of the work then underway on his Phase II report. (Hardy Dec. ¶¶ 8–9; Pierce Dec. ¶ 20; AR 8:199:4253; AR 9:265:4593) On April 12, 2000, Dr. Hardy responded by releasing the following set of preliminary draft recommendations, with the caveat that he would review the technical approach, results, and preliminary draft recommendations with the Technical Team before finalization: *April 1–15, 2000:* 2200 cfs; *April 16–May 15, 2000:* 1800 cfs;

*May 16–June 15, 2000:* 1500 cfs; *June 16–October 31, 2000:* 1000 cfs; and *November 1, 2000–March, 2001:* 1300 cfs. (Hardy Dec. ¶¶ 8–9; Pierce Dec. ¶ 20; AR 8:198:4252; AR 8:199:4253; 9:265:4595)

#### d. *The April 14, 2000 Proposal*

On April 13 and 14, 2000, Dr. Hardy held conference calls with the technical review team to discuss the preliminary flow recommendations that he had presented on April 12, 2000. The technical team unanimously considered the preliminary recommendations to be too low during the April through June period based on current field observations of fish use and habitat conditions within the main stem Klamath River. The team claimed, for example, that the loss of edge cover habitat during this period already was substantial at a flow of approximately 2200 cfs and that fish species observed during the week when flows were maintained at this level showed predator scars and suction wounds indicating predation attacks. (Hardy Dec. ¶¶ 10–11; Pierce Dec. ¶¶ 20–21; AR 9:265:4595–4596)

Dr. Hardy concluded that the biological rationale discussed for higher flows was sound and supported by his analyses. Accordingly, on April 14, 2000, he presented a revised version of the preliminary draft recommendations to the Department of the Interior and the Bureau of Reclamations. (Hardy Dec. ¶¶ 10–11; Pierce Dec. ¶¶ 20–21; AR 9:265:4595–4597) Dr. Hardy's revised recommended flows were: *April–May, 2000:* 2200 cfs; *June 1–15, 2000:* 1800 cfs; *June 16–30, 2000:* 1400 cfs; *July–September, 2000:* 1000 cfs. (AR 9:233:4403; AR 9:265:4597; Pierce Dec.

Table 1 at 12:1–7) Dr. Hardy stressed that "these final recommended flows [were] likely to be modified based on continuing refinement of the analytical studies and subsequent review by the Technical Team". (AR 9:265:4593)

Dr. Hardy spoke directly to two representatives of California's Department of Fish and Game, and one representative of the National Marine Fisheries Services, concerning his revised flow recommendations, and received only positive feedback in response. (Hardy Dec. ¶ 12) On April 14, 2000, he also left voice-mail messages for the members of the technical review team informing them that he had revised the preliminary draft recommendations to reflect the issues raised, and the flow regimes discussed, during their conference calls. (Hardy Dec. ¶ 12) It does not appear, however, that Dr. Hardy stated the exact revised flow recommendations in these messages. (Hardy Dec. ¶ 12; Pierce Dec. 21) Consequently, the team had no opportunity to sign off on his final recommendation.[5] (Pierce Dec. ¶¶ 21–22)

#### e. *The Final 2000 Operations Plan*

On April 26, 2000, the Bureau of Reclamations mailed its Klamath Project 2000 Operations Plan to interested parties, including the National Marine Fisheries Service. (Pierce Dec. ¶ 22; AR 9:292:4775–4780; AR 9:293:4781–4784) The Plan did not adopt Dr. Hardy's April 14, 2000 revised recommended flows, but instead adopted the following minimum flow levels: April 1–25, 2000: 2200 cfs; April 26–May 31, 2000: 1,750 cfs; June 1–15, 2000: 1,500 cfs; and June 16–August 31, 2000: 1,000 cfs; September 1–30, 2000: 1,000–1,300 cfs; and October 1, 2000–March 31, 2001:

---

**5.** The Bureau of Reclamation notes that no team member approached Dr. Hardy with negative feedback concerning his revised recommended flows when the team subsequently convened in mid-May, 2000 to discuss ongoing work on the Phase II report. By that time, however, as discussed *infra,* the Bureau of Reclamations had rendered those revised recommended flows moot by issuing a 2000 Operations Plan that did not incorporate them. *See,* AR 9:292:4779 (Table 1).

1,300 cfs. (AR 9:292:4775–4779, Table 1) These minimum flow levels generally were closer to those which Dr. Hardy originally had proposed on April 12, 2000, and which both he and the technical review team subsequently had concluded were too low.

The different recommendations concerning the minimum flow levels for the 2000 Operations Plan are summarized below in Table 1:

### Table 1: Summary of Minimum Flow Recommendations

| Plan | April | April | May | May | June | June | July | July | Aug. | Sept. |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| PhaseI | 3307 | 3307 | 3056 | 3056 | 2249 | 2249 | 1714 | 1714 | 1346 | 1395 |
| YOY | 2500 | 2500 | 2500 | 1800 | 1300 | 1000 | 1000 | 1000 | 1000 | 1300 |
| 4/4 | 1550 | 1400 | 1200 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 |
| 4/12 | 2200 | 1800 | 1800 | 1500 | 1500 | 1000 | 1000 | 1000 | 1000 | 1000 |
| 4/14 | 2200 | 2200 | 2200 | 2200 | 1800 | 1400 | 1000 | 1000 | 1000 | 1000 |
| Final | 2200 | 1750–2200 | 1750–2200 | 1750–2200 | 1500–1750 | 1000–1400 | 1000 | 1000 | 1000 | 1000–1300 |

#### f. Consultation Between The Bureau of Reclamations and NMFS

On April 1, 2000, while negotiations concerning the operations plan for 2000 still were ongoing, NMFS' biological opinion for the preceding year expired. (AR 4:63:2345, 2363; AR 7:156:4040) Anticipating this deadline, in December 1999, the Bureau of Reclamations had developed and released a proposed schedule for completing a new biological assessment and biological opinion by April, 2000. (Davis Dec. ¶ 2) According to this schedule, the Bureau projected that a final biological opinion would be available by April 24, 2000, i.e., at the start of the 2000 water year. (Id.)

Towards this expressed goal, the Bureau alleges it began informal discussions with NMFS during mid-March, 2000 concerning its 2000 Operations Plan. (AR 7:156:4040) By April 4, 2000, it had developed a draft interim biological assessment describing anticipated Project Operations between April 1, 2000 and March 31, 2001, and the expected impact of these operations on coho salmon. (AR 7:156:4035–4064) The Bureau never released this draft, however. Nor did it complete a final biological assessment specifically addressing the impact of its 2000 Operations Plan.[6] The Bureau attributes this failure to the delay in obtaining the Phase II report, which allegedly was to have supplied "a critical part"

6. See, AR 7:155:4033–4034 (April 4, 2000 letter from the NMFS noting the recent expiration of its biological opinion on the annual operation of the Klamath Project and urging the Bureau of Reclamations to initiate consultation concerning continued Project operations so that consultation might be completed in a timely fashion); AR 7:182:4177–4178 (April 7, 2000 letter from the Bureau of Reclamations contending (1) that it currently was consulting with NMFS concerning "long-term operations of the Klamath Project", (2) that it expected to present a biological assessment concerning the impact of proposed long-term operations on the coho salmon by June 16, 2000, and hoped to receive a biological opinion from NMFS by August 25, 2000, but making no mention of any plan to consult with NMFS concerning the 2000 Operations Plan).

of the needed technical information.[7] (Davis Dec. ¶ 3)

Apparently, the Phase II report was not indispensable, however, because in early-September, 2000, the Bureau began steps to resume the consultation process without having received it. During that month, the Bureau of Reclamations requested an updated list of protected species from NMFS. At the same time, it began preparing a biological assessment for "ongoing project operations". On September 25, 2000, NMFS provided the Bureau with a list of protected species and critical habitat that may be found downstream of Iron Gate Dam. (Davis Dec. ¶ 4; Jacobs Dec. ¶ 2, Ex. 1, p. 15)

On November 22, 2000, the Bureau completed a draft of its biological assessment and provided copies to Klamath Basin Tribes and project water users for review. (Davis Dec. ¶ 4) Thereafter, on January 22, 2001, the Bureau released the final version of its biological assessment addressing the Klamath Project's "continuing operations" and the impact of those operations on the SO/NCC coho salmon and its critical habitat. (Jacobs Dec. ¶ 2, Ex. 1) The same day, it sent NMFS a letter requesting the initiation of formal consultation on the same subject. (Jacobs Dec. ¶ 2, Ex. 2) The Bureau expected to receive NMFS' biological opinion by April 1, 2001, and reportedly intended to use it (1) to formulate an operations plan for the 2001 water year, and also (2) to guide project operations after 2001, until it completes a long-term operations plan and Environmental Impact Statement. (Davis Dec. ¶ 5)

### B. *Procedural History*

Plaintiffs filed this action on May 31, 2000 alleging claims for relief based upon (1) the National Environmental Policy Act, (2) the Wild and Scenic Rivers Act, and (3) the Reclamation Act. On June 8, 2000, plaintiffs filed a motion for a preliminary injunction and application for a temporary restraining order. By Order entered on June 20, 2000, the Court denied both the motion and the application. Plaintiffs subsequently filed a First Amended Complaint adding two claims for relief based on the Endangered Species Act. The Court subsequently granted Klamath Water Users' Association (hereinafter "Intervenor") leave to intervene in the case as a defendant.

On October 16, 2000, the U.S. Department of Justice filed a nine-volume administrative record with the Court. Thereafter, plaintiffs filed a motion for summary judgment seeking declaratory and injunctive relief. With the Court's permission, Klamath Tribe has submitted a brief as *amicus curiae* in connection with that motion. The Bureau of Reclamations opposes plaintiffs' motion and has filed its own counter-motion for summary judgment. Intervenor also has filed a motion for summary judgment. The parties have fully briefed these motions and the Court now considers each in turn.

### II. *DISCUSSION*

#### A. *Plaintiff's Motion for Summary Judgment*

Plaintiffs open their motion for summary judgment by voluntarily dismissing their claims under the National Environmental Policy Act, the Wild and Scenic Rivers Act, and the Reclamation Act. *See,* Pl.'s Motion for Summary Judgment, at 1:27–28. They seek an order granting summary judgment in their favor, and de-

---

7. As of January 23, 2001, the Phase II report still had not issued. *See,* Jacobs Dec. ¶ 2, Ex. 1, p. 15 n.3.

claratory and injunctive relief, based upon their fourth claim for relief under the Endangered Species Act. The Court will consider the parties' arguments in support of, and in opposition to, plaintiffs' motion.

### 1. Standard of Review

#### a. Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the initial burden of demonstrating the "absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. If the movant meets this burden, the nonmoving party must come forward with specific facts demonstrating a genuine factual issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

#### b. Judicial Review of ESA Claims Under the APA

The ESA makes no specific provision for judicial review of agency actions or decisions taken in pursuance of its requirements. Thus, the scope of review is governed by the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"). *See, Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515 (9th Cir.1998) (looking to APA for standard of review applicable to agency action under the ESA). Under the APA, an agency's actions, findings, and conclusions may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "To make this finding, the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* "This is especially appropriate where, as here, the challenged decision implicates substantial agency expertise." *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir.1993) (citing *U.S. v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir.1989) ("Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving ... scientific matters"), *cert. denied*, 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990)).

In determining whether the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, "the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. "The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Id.* at 743–44, 105 S.Ct. 1598.

## 2. *Analysis*

Plaintiffs base their fourth claim for relief under the ESA on allegations that the Bureau of Reclamations failed to consult with the NMFS concerning the impact of the Klamath Project 2000 Operations Plan as required by section 7(a)(2) of the Act. They seek an order declaring that the Bureau is in violation of section 7(a)(2) of the ESA and, on that basis, enjoining it from sending irrigation deliveries from Klamath Project whenever Klamath River flows at Iron Gate Dam drop below the minimum flows recommended in Dr. Hardy's Phase I report until the NMFS issues a legally valid biological opinion and the Bureau of Reclamations complies with the terms of it.

### a. *The Purpose of the ESA*

"One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies 'to *insure* that actions *authorized, funded,* or *carried out* by them do not *jeopardize* the continued existence' of an endangered species or '*result* in the destruction or modification of habitat of such species ...'" *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 173, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (quoting 16 U.S.C. § 1536(a)(2)).

"The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Id.* at 184, 98 S.Ct. 2279. "[T]he legislative history undergirding § 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared nation-al policy of saving endangered species." *Id.* at 185, 98 S.Ct. 2279 (Congress made "a conscious decision ... to give endangered species priority over the 'primary missions' of federal agencies").

### b. *The ESA's Consultation Requirement*

"The [Endangered Species Act] prescribes a three-step process to ensure compliance with its substantive provisions by federal agencies. Each of the first two steps serves a screening function to determine if the successive steps are required." *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir.1985). Those steps are:

(1) "An agency proposing to take an action must inquire of the [Secretary of the Interior [8]] whether any threatened or endangered species "may be present" in the area of the proposed action." *Id.* (citing 16 U.S.C. § 1536(c)(1)). For the purposes of this requirement, "agency action" means "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies", including "actions directly or indirectly causing modifications to the land [or] water." 50 C.F.R. § 402.02. *See,* 50 C.F.R. § 402.03 ("Section 7 ... [applies] to all actions in which there is discretionary Federal involvement or control"). Both the Supreme Court and the Ninth Circuit have construed this term broadly." *See, Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054–55 (9th Cir.1994) (citing *Tennessee Valley, supra*).

(2) "If the answer is affirmative, the agency must prepare a 'biological assessment' to determine whether such species 'is likely to be affected' by the action." *Thomas, supra,* 753 F.2d at 763 (quoting

---

8. In this case, the Secretary has delegated her authority to the National Marine Fisheries Service 50 C.F.R. § 402.01(b).

16 U.S.C. § 1536(c)(1)).[9] "A biological assessment shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action". 50 C.F.R. § 402.12.

(3) If the agency determines, based on its biological assessment, that the action it proposes to take "may affect" a threatened or endangered species, "formal consultation is required." 50 C.F.R. § 402.14(a).[10] *See, Natural Resources Defense Council v. Houston,* 146 F.3d 1118, 1125 (9th Cir.), *cert. denied,* 526 U.S. 1111, 119 S.Ct. 1754, 143 L.Ed.2d 786 (1999). A written request is required to initiate formal consultation, and the agency seeking consultation must provide the relevant Service (here, the NMFS) with "the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat." 50 C.F.R. § 402.14(c).

"The formal consultation results in a 'biological opinion' issued by the [NMFS]." *Thomas, supra,* 753 F.2d at 763 (citing 16 U.S.C. § 1536(b)). The biological opinion shall set forth in writing the opinion of the NMFS, "and a summary of information on which the opinion is based detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). "If the Biological Opinion concludes that the proposed action is likely to jeopardize a protected species, the agency must modify its proposal." [11] *Natural Resources, supra,* 146 F.3d at 1125. In such case, the NMFS may also suggest "reasonable and prudent alternatives to the proposed action", but those alternatives by definition "may not jeopardize the listed species or result in the destruction or adverse modification of its critical habitat." *American Rivers v. National Marine Fisheries Service,* 126 F.3d 1118, 1122 (9th Cir.1997) (citing 16 U.S.C.4F 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3)).

If, on the other hand, the federal agency determines that the action it proposes to take is "not likely to adversely affect" an endangered or threatened species, it may attempt informal (instead of formal) consultation.[12] *Silver v. Babbitt,* 924 F.Supp. 976, 982 (D.Ariz.1995) (citing 50 C.F.R.

---

9. *See,* 50 C.F.R. § 402.14(a) ("Each federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat").

10. "Formal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed". 50 C.F.R. § 402.14(c).

11. Under section 7(a)(2) of the Act, the Secretary of the Interior must ensure that an action of a federal agency is not likely to jeopardize the continued existence of any threatened or endangered species. 16 U.S.C. § 1536(a)(2). " 'Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, number, or distribution of that species.' " *Conner v.*

*Burford,* 848 F.2d 1441, 1452 (9th Cir.1988) (quoting Interagency Cooperation—Endangered Species Act of 1973, As Amended, 51 Fed.Reg. 19, 958 (1986) (codified at 50 C.F.R. § 402.02 (1986))).

12. "Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency ..., designed to assist the Federal agency in determining whether formal consultation or a conference is required. If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13(a).

§ 402.13(a)). In such case, the NMFS "must issue a written concurrence in the determination or may suggest modifications that the [agency proposing the action] could take to avoid the likelihood of adverse effects to the listed species." *Id.* (citing 50 C.F.R. § 402.13(b)). "If no such concurrence is reached, the regulations require that formal consultation occur." *Id.* (citing 50 C.F.R. § 402.14). In sum, therefore, "[f]ormal consultation is excused only where (1) an agency determines that its action is unlikely to adversely affect the protected species or habitat, *and* (2) the relevant Service ([in this case,] NMFS) concurs with that determination." *Natural Resources, supra,* 146 F.3d at 1126 (italics in original) (citing 50 C.F.R. § 402.14(b); *Pacific Rivers, supra,* 30 F.3d at 1054 n. 8).

"Only after [the federal agency] complies with § 7(a)(2) can any activity that may affect [a] protected [species] go forward." *Pacific Rivers, supra,* 30 F.3d at 1056–1057. *See, Greenpeace v. National Marine Fisheries Service,* 106 F.Supp.2d 1066, 1075 (W.D.Wash.2000) ("the duty [of consultation created by section 7] must be fulfilled *before* initiation of agency action") (emphasis added). If the federal agency initiates consultation concerning its proposed action, then the district court must decide whether "the ongoing or announced activities can proceed during the consultation period" pursuant to section 7(d) of the ESA. *Pacific Rivers, supra,* 30 F.3d at 1057.

Section 7(d) provides:

After initiation of consultation required under subsection (a)(2) of this section, the Federal agency ... shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section. 16 U.S.C. § 1536(d). "This prohibition is in force during the consultation process and continues until the requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09.

The Ninth Circuit has cautioned that section 7(d) does not stand for the proposition that a federal agency may initiate action *before* a "comprehensive biological opinion" has issued merely because the action will not irreversibly or irretrievably commit resources. *See, Conner v. Burford,* 848 F.2d 1441, 1455 n. 34 (9th Cir. 1988). "Rather, section 7(d) clarifies the requirements of section 7(a), ensuring that the status quo will be maintained during the consultation process." *Id.* Moreover, as the "plain language makes clear, § 7(d) applies only *after* an agency has initiated consultation under § 7(a)(2)." *Pacific Rivers, supra,* 30 F.3d at 1056. Section 7(d), therefore, "does not serve as a basis for *any* governmental action unless and until consultation has been initiated." *Id.*

In *Thomas, supra,* the Ninth Circuit reasoned that "the strict substantive provisions of the ESA justify *more* stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions." *Thomas, supra,* 753 F.2d at 764. The *Thomas* court concluded that if a project is allowed to proceed without substantial compliance with those procedural requirements, "there can be no assurance that a violation of the ESA's substantive provisions will not result", a consequence which the Ninth Circuit deemed "impermissible". *Id.* (citing *Tennessee Valley, supra*).

### c. *Consultation Concerning the 2000 Operations Plan*

■ Despite the weight which the Ninth Circuit repeatedly has placed upon the

procedural requirements of the ESA, it is clear that the Bureau of Reclamations failed to comply with these requirements before implementing its 2000 Operations Plan for the Klamath Project.

First, the Bureau did not convey to NMFS, for the purpose of evaluating its 2000 Operations Plan, either (1) a written request for a list of protected species or designated or proposed critical habitats that might be present in the action area during that water year, or (2) a written notification of the species and critical habitat that were being included in its biological assessment of that annual plan. *See,* 50 C.F.R. § 402.12(c) (requiring such action).

Second, it never completed a biological assessment evaluating the potential effects of the 2000 Operations Plan on protected species and their critical habitats. *See, Thomas, supra,* 753 F.2d at 763 ("Once an agency is aware that an endangered species may be present in the area of its proposed action, the ESA requires it to prepare a biological assessment to determine whether the proposed action 'is likely to affect' the species and therefore requires formal consultation"); 50 C.F.R. § 402.12(a).

Third, despite its recognition that "the potential impacts" of Klamath Project operations on the coho salmon "warranted" formal consultation concerning "annual operating plans" (Def.s' Counter–Motion at 19:14–18), and despite the fact that it (1) formally consulted with the NMFS concerning the 1998 and 1999 operations plans (AR 7:156:4040), (2) devised a schedule for formal consultations concerning the 2000 Operations Plan in December 1999 (Davis Dec. ¶ 2), (3) prepared a draft biological assessment of the 2000 Operations Plan, acknowledging that the plan was likely to adversely affect the coho salmon (AR 7:156:4037), and (4) received a letter from

the NMFS specifically requesting that it initiate formal consultation (AR 7:155:4033–4034), the Bureau never did begin the formal consultation process with respect to this plan.

The Bureau and Intervenor argue (1) that federal regulations precluded the Bureau from initiating formal consultation before it had completed a biological assessment, (2) that the Bureau ultimately did complete the biological assessment and request formal consultation, (3) that it also informally consulted with the NMFS concerning its 2000 Operations Plan, and (4) that plaintiffs' fourth claim for relief based upon an alleged violation of section 7(a)(2) is not ripe for review because consultation between the Bureau and the NMFS has not concluded and, consequently, there is no completed agency action in dispute. These arguments each lack merit for the following reasons.

First, the Bureau cannot avoid formal consultation indefinitely by postponing the preparation of, or simply failing to complete, a biological assessment. Such a result would render meaningless the consultation requirement and would be completely at odds with the clear mandate of the ESA, which placed a national priority on halting and reversing the trend toward species extinction. *See, Tennessee Valley, supra,* 437 U.S. at 184–185, 98 S.Ct. 2279, 57 L.Ed.2d 117. Moreover, the regulations specifically preclude such a result by requiring that federal agencies review their actions "at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). To ensure that agencies comply with this requirement, the regulations set forth specific deadlines for each stage of the process through consultation. According to these specific provisions, a federal agency (1) "shall complete the biological assessment within 180 days

after its initiation...", 50 C.F.R. § 402.12(i), and (2) "shall submit the completed biological assessment [to the proper service (in this case, NMFS)] for review", 50 C.F.R. § 402.12(j). The NMFS then is obligated to "respond in writing within 30 days as to whether or not [it] concurs with the findings of the biological assessment."[13] *Id.* The Bureau of Reclamations did not comply with these requirements. It did not complete a review of its proposed action (the 2000 Operations Plan) "at the earliest possible time". Indeed, it never completed a biological assessment of the plan at all. Nor has it presented the Court with evidence that it ever finally determined whether the plan was "likely to adversely affect" and/or "jeopardize the continued existence" of the threatened coho salmon or its critical habitat.

Second, while the Bureau ultimately did (1) request an updated species list, (2) release a final biological assessment, and (3) request formal consultation, it did not begin these actions until September, 2000, almost half-way through the 2000 water year and more than five months after the NMFS' 1999 biological opinion had expired. Moreover, the Bureau did not by these actions initiate formal consultation concerning the 2000 Operations Plan. Nor did it seek formal consultation concerning a 2001 Operations Plan or any concrete long-term plan for project operations. Instead, it sought information which it expects to use in the *eventual* formulation of a long-term operations plan. *See,* Jacobs Dec. Ex. 1. The undisputed facts establish, therefore, that the Bureau of Reclamations

still has not rendered a biological assessment, or obtained a biological opinion, concerning the likely impact on the coho salmon or its critical habitat of a plan which has been in effect now for almost a year, *i.e.,* the 2000 Operations Plan. The evidence is undisputed, therefore, that it never formally consulted with the NMFS concerning this plan.

■ The Bureau and Intervenor submit (1) that the Bureau did *informally* consult with NMFS concerning its 2000 Operations Plan and (2) that it, therefore, was authorized under section 7(d) to operate the Project according to the plan, so long as the plan did not call for "any irreversible or irretrievable commitment of resources". 16 U.S.C. § 1536(d). The Court does not agree with this conclusion. The regulations define "informal consultation" as "an optional process ... designed to assist the Federal agency in determining whether formal consultation ... is required." 50 C.F.R. § 402.13(a). There is no evidence that the Bureau of Reclamations required informal consultation to make this determination. Indeed, the evidence establishes, to the contrary, (1) that the Bureau knew full well its operation of the Project pursuant to the plan might affect the coho salmon, and (2) that formal consultation, therefore, was required.[14] *See,* AR 7:156:4040 (confirming that the Bureau formally consulted with the NMFS concerning . the 1998 and 1999 annual plans); Davis Dec. ¶ 2 (confirming that the Bureau expected to formally consult with

**13.** While the regulations do permit the Bureau of Reclamations and the NMFS to agree on a different time table, neither the Bureau nor Intervenor has referred the Court to evidence of such an agreement. Nor does it appear that one existed. *See,* AR 7:155:40333–4034 (letter from the NMFS dated April 4, 2000 entreating the Bureau to begin the process by requesting consultation,

and promising to meet the deadlines set forth in the regulations once consultation commenced).

**14.** *See,* 50 C.F.R. § 402.14(a) (federal agency must initiate formal consultation if it determines that its proposed action "may" affect a protected species).

the NMFS concerning its 2000 Operations Plan as well and that it had developed a proposed schedule for such consultation by December 1999); AR 7:156:4037 (the Bureau's draft biological assessment concerning the 2000 Operations Plan, concluding that the plan was "likely to adversely affect" the coho salmon); Def.s' Counter-Motion for Sum. Judg. at p. 19:14–17 (acknowledging that the impact of Project operations on the coho salmon warranted formal consultation concerning annual operation plans).

Based upon its review of the administrative record and the evidence presented for its consideration in ruling on the pending summary judgment motions, the Court concludes that the communications between the Bureau of Reclamations and the NMFS concerning the Bureau's 2000 Operations Plan did not constitute "informal consultation" as that term is envisioned by the regulations, see, 50 C.F.R. § 402.13(a), because they were not designed to assist the Bureau in determining whether its plan "might" affect the threatened coho salmon or its critical habitat, such that formal consultation was required, see, 50 C.F.R. § 402.14(a). To the contrary, a review of the record and the evidence before the Court indicates that these communications were designed to assist in determining the *extent* of the plan's impact on the coho salmon, in order to streamline the formal consultation that all involved expected would result and for which the Bureau already had developed a schedule. The NMFS confirmed this purpose in its April 4, 2000 letter to the Bureau entreating it to begin the consultation process. *See,* AR 7:155:4033–4034.

The Court finds additional confirmation for this conclusion in the fact that, although it submitted a number of declarations to support its position on other issues, the Bureau submitted no declaration at all to confirm or describe its alleged "informal consultation" with the NMFS concerning the 2000 Operations Plan. This omission is all the more striking given (1) that it was well within the Bureau's power to submit such a declaration, (2) that it *did* submit the declaration of the individual who represented the Bureau on the technical review team and who allegedly participated in at least some of the "informal consultation", *see,* Dugan Dec., and (3) that it also submitted a cautiously phrased declaration from a NMFS representative purporting to confirm "informal consultation" concerning a possible long-term operations plan, *see,* Lecky Dec. ¶ 3.

For the reasons stated above, therefore, the Court concludes that the Bureau did not consult, either formally or informally (as those terms are defined in the regulations), with the NMFS concerning its Klamath Project 2000 Operations Plan. The Ninth Circuit has ruled that section 7(d) "does not serve as a basis for *any* governmental action unless and until consultation has been initiated." *Pacific Rivers, supra,* 30 F.3d at 1056. Because the Bureau did not initiate consultation, it had no basis or authority to implement the 2000 Operations Plan and it violated the ESA when it did so.

Even if the Bureau could be said to have engaged in "informal consultation", however, this process could not continue indefinitely. As noted above, the Bureau had an obligation to determine "at the earliest possible time" whether its annual plan might affect a protected species or its critical habitat. *See,* 50 C.F.R. § 402.14(a). Informal consultation terminates once the Bureau makes such a determination. If the Bureau concludes that its proposed action is not likely to adversely affect a protected species or its critical habitat, and the NMFS concurs in writing, then all consultation ends. *See,* 50 C.F.R.

§§ 402.13(a), 402.14(1)(3). Absent such a conclusion and concurrence, formal consultation is required. *See, Natural Resources, supra,* 146 F.3d at 1126.

In this case, the Bureau's "informal consultations" produced no final conclusion concerning the likely impact of its 2000 Operations Plan on the coho salmon. This omission had the affect of placing the plan, and project operations, in a type of administrative limbo. Because the Bureau did not make a final determination, the NMFS could not decide whether to concur and, consequently, formal consultation never began. Because formal consultation never began, the Bureau was not forced to confront a possible NMFS determination that its annual plan jeopardized the continued existence of the coho salmon or its critical habitat. Nor was it required to address any "reasonable and prudent alternatives" the NMFS might have proposed to remedy such a problem. Instead, unencumbered by any biological opinion from the NMFS (because it never requested one), the Bureau simply implemented its annual plan for the 2000 water year and operated Klamath Project pursuant to it without ever concluding the alleged consultation process.

This failure to reach a final conclusion easily might be construed as a deliberate (and successful) effort to avoid formal consultation and a possible "jeopardy" finding, especially given the Bureau's subsequent admission that formal consultation was warranted. Whether this is true or not, the Court need not decide, because regard- less of the Bureau's motive, by operating Klamath Project for an entire year pursuant to the 2000 Operations Plan without finally determining whether the flow levels provided for therein might affect a listed species or its critical habitat, it failed to insure that its action "was not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the critical habitat of such a species. In so doing, the Bureau of Reclamation clearly violated section 7(a)(2) of the ESA.

The Bureau and Intervenor argue that summary judgment in favor of plaintiffs' on the fourth claim for relief is not warranted, however, because the claim is not ripe for review. They contend that consultation concerning the Bureau's annual operating plans and/or its eventual long-term plan is not complete and, consequently, there is no final decision and, by extension, no live case or controversy for judicial review.[15] The Bureau relies for this argument, *inter alia,* on the Ninth Circuit's decision in *American Rivers, supra.*[16] Its own description of the facts at issue in that case confirms, however, that the decision is inapplicable because the plaintiffs' claim there was different. In *American Rivers,* the plaintiffs brought suit to challenge a NMFS biological opinion. After they filed suit, the original biological opinion was superseded by a new biological opinion.

In this case, in contrast, plaintiffs challenge the Bureau's right to operate Klamath Project without consultation con-

---

15. Intervenor also purports to incorporate by reference the Bureau of Reclamation's argument that plaintiffs' fourth claim is moot. *See,* Intervenor's Opp. to Sum. Judg. at 17:7–9. The Bureau never made such an argument, however, *see,* the Bureau's Reply in Support of Counter–Motion for Sum. Judg., at 7:20–21 ("[the Bureau] has never argued that plaintiffs' claim is moot"), and Intervenor of-

fers no independent argument or authorities to support such a finding. Accordingly, the Court does not address "mootness" in this decision.

16. The Intervenor incorporates the Bureau's arguments by reference in its opposition to plaintiffs' motion for summary judgment.

cerning the annual plan guiding the operation. In failing (1) to complete a biological assessment concerning the likely impact of this plan, or (2) to initiate consultation concerning it, the Bureau of Reclamations violated the procedural requirements of the ESA. Contrary to what the Bureau argues, plaintiffs do not challenge some "contingent future event", therefore, but rather the current violation of the ESA's procedural requirements. Where the Ninth Circuit has confronted comparable substantive violations of these procedural requirements, it has not hesitated to take action. *See e.g., Pacific Rivers, supra,* (enjoining Forest Service from proceeding with ongoing and announced projects under land resource management plans prior to consultation with the NMFS); *Lane County Audubon Soc'y v. Jamison,* 958 F.2d 290, 294 (9th Cir.1992) (enjoining Bureau of Land Management from proceeding with any new sales of timber until consultation on a forest management plan and its effect on a threatened species was completed); *Thomas, supra,* (enjoining construction of a timber road where the federal agency proposing to build the road failed to prepare a biological assessment). Accordingly, the Court finds that plaintiffs' fourth claim here is ripe for review.

For all of the reasons set forth above, and based upon the undisputed evidence before it, the Court finds that the Bureau of Reclamations did violate section 7(a)(2) of the ESA by implementing its 2000 Operations Plan, and operating Klamath Project pursuant to that plan for an entire year, (1) without first completing a biological assessment evaluating the plan's potential effects on threatened and endangered species and their critical habitats in the action area, and (2) without ever initiating consultation concerning the plan, even though it knew that consultation was required and that formal consultation, in particular, was warranted. *See, Natural Re-*

*sources, supra,* 146 F.3d at 1126 ("Before initiating any agency action in an area that contains threatened or endangered species or a critical habitat, the agency *must* (1) make an independent determination of whether its action 'may affect' a protected species or habitat, or (2) initiate a formal consultation") (emphasis added); *Id.* at 1127 (agency "acted arbitrarily and capriciously and not in accordance with the law" in renewing water contracts prior to completing required endangered species consultations).

Based upon these findings, the Court hereby GRANTS plaintiffs' motion for summary judgment in their favor on the fourth claim, and DENIES the motions for summary judgment of the Bureau and Intervenor insofar as they relate to plaintiffs' fourth claim.

#### d. *Injunctive Relief*

The Supreme Court and the Ninth Circuit both have held that section 7 of the Endangered Species Act imposes "a significant restriction on the court's equity jurisdiction." *Sierra Club v. Marsh,* 816 F.2d 1376, 1383 (9th Cir.1987). *See, e.g., Tennessee Valley, supra,* 437 U.S. at 193–95, 98 S.Ct. at 2291 (holding that Congress explicitly had foreclosed the exercise of traditional equitable discretion by courts faced with a violation of section 7 of the ESA); *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313–314, 102 S.Ct. 1798, 1803–04, 72 L.Ed.2d 91 (1982) ("The purpose and the language of the [ESA] limited the remedies available to the District Court; only an injunction could vindicate the objectives of the Act").

"In Congress's view, projects that jeopardized the continued existence of endangered species threatened incalculable harm; accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species."

Sierra Club, supra, 816 F.2d at 1383 (citing Tennessee Valley, 437 U.S. at 187–88, 194–95, 98 S.Ct. at 2298–99, 2301–02). To further its policy of protecting endangered species, Congress established certain procedural requirements. "The substantive and procedural provisions of the ESA are the means determined by Congress to assure adequate protection. Only by requiring substantial compliance with the act's procedures can we effectuate the intent of the legislature." Id. at 1384. As the Ninth Circuit stated in Thomas, supra,

> If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible.

753 F.2d at 764 (citing Tennessee Valley, supra).

■ "Given a substantial procedural violation of the ESA in connection with a federal project, [therefore,] the remedy must be an injunction of the project pending compliance with the ESA." [17] Thomas, supra, 753 F.2d at 764. The Ninth Circuit has held that the failure to complete a biological assessment or to consult concerning a federal project are substantial procedural violations justifying an injunction. See e.g., id. at 763–765 (enjoining construction of a timber road in former national forest roadless area where federal agency failed to prepare biological assessment to determine the impact of the road and proposed timber sales on the endangered Rocky Mountain Gray Wolf); Lane, supra, 958 F.2d at 295 (enjoining timber sales pending consultation concerning federal agency's management guidelines for conservation of northern spotted owl); Pacific Rivers, supra, 30 F.3d at 1056–1057 (enjoining ongoing and announced timber sales, range activities, and road building projects under land resource management plans that might affect the threatened chinook salmon pending consultation).

■ The Court concludes that plaintiffs here are entitled to injunctive relief because the Bureau of Reclamations committed a substantial procedural violation of the Endangered Species Act in operating Klamath Project for an entire year pursuant to its 2000 Operations Plan without completing a biological assessment of the likely impact of that plan on the threatened coho salmon or its critical habitat, or engaging in consultation as the Act and the regulations specifically required it to do. While the Bureau finally did initiate formal consultation, that consultation is not as yet complete and, given the Bureau's past performance, there is no guarantee that it will be completed as promptly as the Act and the regulations require. Moreover, the current consultation does not address any concrete annual or long-

---

17. The Bureau of Reclamations and Intervenor argue that an injunction is not appropriate here because plaintiffs have not established any injury or harm to the threatened coho salmon resulting from implementation of the Bureau's Klamath Project 2000 Operations Plan. The Ninth Circuit expressly rejected the same argument in Thomas v. Peterson. See, Thomas, 753 F.2d at 764–765 ("It is not the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed"). The Bureau also suggests that plaintiffs lacked standing to bring this action because the alleged harm to the coho salmon is "speculative". The Court does not consider this argument because the Bureau raised it for the first time in a footnote to its reply brief, leaving plaintiffs no opportunity to respond. See, Omega Environmental, Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1167 (9th Cir.), cert. denied, 525 U.S. 812, 119 S.Ct. 46, 142 L.Ed.2d 36 (1998) (declining to address argument raised for first time in reply brief).

term operations plan, but rather seeks information with which to formulate such plans in the future. The flow levels provided for in the 2000 Operations Plan apparently generated some controversy. With the commencement of a new water year, however, that plan has expired and the Court has been presented with no evidence that project operations currently are governed by any concrete plan at all.[18] Certainly, any plan now in effect has not been subjected to the scrutiny of the required consultation process.[19]

Ordinarily, where an injunction is appropriate based on a substantial procedural violation of the ESA, courts have enjoined further work on the disputed project pending compliance with the Act's procedural requirements. In this case, an order enjoining operation of the entire Klamath Project does not appear appropriate, because it might do significant injury to the very coho salmon whom plaintiffs seek to protect and/or to other endangered or threatened species who rely on water from the project. Plaintiffs therefore request more narrow relief, namely, an order enjoining the Bureau from sending irrigation deliveries from Klamath Project whenever Klamath River flows at Iron Gate Dam drop below the minimum flows recommended in Dr. Hardy's Phase I report until the NMFS issues a comprehensive biological opinion on some proposed action and the Bureau complies with the terms of that biological opinion.

It is true that the Phase I report was interim in nature and prepared without benefit of the results of site-specific studies then under way. The Court has no evidence before it, however, indicating that such studies have since been completed. Moreover, the Phase I report was based upon extensive input from the members of a technical team, including Bureau of Reclamation staff, and was created specifically to address the situation which the Bureau apparently still is confronting, namely, the need to present instream flow recommendations without completed site-specific studies. Neither the Bureau nor Intervenor direct the Court to any better science. Nor do they offer a counter proposal concerning the type of injunction that should be entered. Based upon its review of the administrative record, and the evidence presented by the parties, and guided by Congress' policy of "institutionalized caution", see, Tennessee Valley, supra, 437 U.S. at 194, 98 S.Ct. at 2302, therefore, the Court concludes that the Phase I report is

---

18. While the Bureau contends that operations during 2001 will be guided by the flow levels presented in its recent biological assessment, the biological assessment presented a number of different flow proposals depending upon the type of water year in issue, and there is no indication which of these alternatives the Bureau seeks to apply, if any, in the new water year.

19. Even if the Bureau of Reclamation's 2001 biological assessment could be said to present a specific plan for the coming water year, and the Bureau's subsequent initiation of consultation could be said to have triggered the provisions of section 7(d), the Court finds that the operation of Klamath Project according to any minimum flow levels contained in such a plan would constitute an irreversible and irretrievable commitment of resources having the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this action, because it would permit the diversion of water which may be necessary to protect the threatened coho salmon and its critical habitat from jeopardy. Once that water is diverted to other uses, it may not be recaptured. Nor can the effect on the coho salmon or its critical habitat be undone if the proposed flows are too low. See, Lane County, 958 F.2d at 295 (timber sales constitute per se irreversible and irretrievable commitments of resources under section 7(d)). Consequently, the Bureau may not proceed with such a plan during the consultation period.

the best science currently available and that it appropriately may be used as a guide for the Court's injunction, pending the Bureau's proposal of some concrete operations plan (whether annual or long-term), and completion of the consultation process with respect to it.

Accordingly, plaintiffs' request for injunctive relief hereby is GRANTED, and the Bureau of Reclamations hereby is enjoined from sending irrigation deliveries from Klamath Project whenever Klamath River flows at Iron Gate Dam drop below the minimum flows recommended in the Hardy Phase I report, until such time as the Bureau completes a concrete plan to guide operations in the new water year, and consultation concerning that plan is completed, either by (1) formal consultation to a "no jeopardy" finding by the NMFS, or (2) the Bureau's final determination, with the written concurrence of the NMFS, that the proposed plan is unlikely to adversely affect the threatened coho salmon.[20]

### B. Defendants' Motion for Summary Judgment

For the reasons set forth above, the Court DENIES the Bureau of Reclamation's Counter–Motion for Summary Judgment, and Intervenor's Motion for Summary Judgment, with respect to plaintiffs' fourth claim for relief. See, supra, at Section II, A, 2. The Bureau and Intervenor also seek summary judgment of plaintiffs'

fifth claim. Plaintiffs base that claim upon an alleged violation of section 7(d). They contend that the Bureau of Reclamations violated section 7(d) by delivering water to irrigators and reducing flows in the Klamath River to levels that have caused, and will continue to cause, harm to listed coho salmon, in a manner that constituted an irreversible or irretrievable commitment of resources, before it completed consultation concerning a plan for its long-term operation of Klamath Project. (First Amended Complaint ¶¶ 60–61)

As noted above, section 7(d) provides that:

> [a]fter initiation of consultation required under subsection (a)(2) of this section, the Federal agency ... shall not make any irreversible or irretrievable commitment of resources with respect to the [proposed] agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

16 U.S.C. § 1536(d). The Ninth Circuit has concluded that this section "applies only after an agency has initiated consultation under § 7(a)(2)." Pacific Rivers, supra, 30 F.3d at 1056 (emphasis added). By its own admission, the Bureau has not completed and, therefore, cannot be said to have initiated, consultation concerning a long-term operations plan for Klamath

---

**20.** The Court rejects Intervenor's arguments (1) that it lacks the authority to enter such an order because the ditches and canals that carry the water of the Klamath Project are privately operated, and (2) that the rights of irrigators should override concerns protected by the ESA. In Klamath Water Users Protective Assoc. v. Patterson, 204 F.3d 1206 (9th Cir.), amended, by 203 F.3d 1175, cert. denied, —— U.S. ——, 121 S.Ct. 44, 148 L.Ed.2d 14 (2000), the Ninth Circuit confirmed that "the United States retains overall authority over

decisions on use of [Klamath] Project water." Id. at 1213. Moreover, "[b]ecause Reclamation retains authority to manage the [Link River] Dam, and because it remains the owner in fee simple of the Dam, it has responsibilities under the ESA as a federal agency." The Ninth Circuit found that "[t]hese responsibilities include taking control of the Dam when necessary to meet the requirements of the ESA, requirements that override the water rights of the Irrigators." Id. (emphasis added).

Project. *See,* Jacobs Dec. Ex. 1, p. 2 (the Bureau's January 22, 2001 "Biological Assessment Of The Klamath Project's Continuing Operations on [SO/NCC] ESU Coho Salmon and [Its] Critical Habitat" confirming that the Bureau was still "developing a long-term operations plan ... for the Project"). Section 7(d), therefore, does not apply.

█ Because the Bureau of Reclamations currently (1) has not completed a long-term operations plan, (2) has not initiated consultation concerning such a concrete long-term plan, and (3) has not begun operating Klamath Project pursuant to such a plan, plaintiff's fifth claim for relief based upon an alleged violation of section 7(d) is not yet ripe for review. *See, Deakins v. Monaghan,* 484 U.S. 193, 199, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988) ("Article III of the Constitution limits federal courts to the adjudication of actual, ongoing controversies between litigants"). *See,* Pl.s' Motion at 23:26–28 (acknowledging that their fifth claim is not ripe for review). To the extent that plaintiffs seek relief based upon the Bureau's operation of Klamath Project for an entire year without ever initiating consultation concerning the plan that guided those operations, the proper method is a claim based upon section 7(a)(2), the section which provided the basis for plaintiffs' fourth claim for relief.

Because plaintiffs' fifth claim for relief is not ripe for review, the Court hereby GRANTS summary judgment in favor of the Bureau of Reclamations and Intervenor with respect to it.

### C. *Miscellaneous Issues*

Intervenor also filed a Request for Judicial Notice and a Request to Strike certain declarations and exhibits. The Court did not rely, in reaching its decision, on any of the material (1) presented in the Request for Judicial Notice or (2) referenced in the motion to strike. Accordingly, both the Request for Judicial Notice and the Request to Strike hereby are DENIED as moot.

### III. *CONCLUSION*

For all of the foregoing reasons, the Court hereby (1) GRANTS plaintiffs' motion for summary judgment; (2) GRANTS in part and DENIES in part defendant's cross-motion for summary judgment; (3) GRANTS in part and DENIES in part intervenor's motion for summary judgment; (4) DENIES Intervenor's Request for Judicial Notice; (5) DENIES Intervenor's Request to Strike Declarations and Exhibits; and (6) ORDERS that the Bureau of Reclamations hereby is enjoined from sending irrigation deliveries from Klamath Project whenever Klamath River flows at Iron Gate Dam drop below the minimum flows recommended in the Hardy Phase I report, until such time as the Bureau completes a concrete plan to guide operations during the new water year, and consultation concerning that plan is completed, either by (1) formal consultation to a "no jeopardy" finding by the NMFS, or (2) the Bureau's final determination, with the written concurrence of the NMFS, that the proposed plan is unlikely to adversely affect the threatened coho salmon.

IT IS SO ORDERED.